**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DIVISION OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| DONNA YARBROUGH, Individually, | § | |
| TROY YARBROUGH, Individually, | § | |
| and as Parents and as Next Friends | § | |
| of C.Y., A Minor Child, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **V.** | § | |
| | § | **CIVIL ACTION NO.: 3:18-cv-00287** |
| SANTA FE INDEPENDENT SCHOOL | § | |
| DISTRICT; BOARD OF TRUSTEES | § | |
| OF SANTA FE INDEPENDENT | § | |
| SCHOOL DISTRICT; DR. LEIGH | § | **JURY DEMANDED** |
| WALL, INDIVIDUALLY AND IN HIS | § | |
| OFFICIAL CAPACITY AS | § | |
| SUPERINTENDENT; MARK KANIPES, | § | |
| INDIVIDUALLY AND IN HIS | § | |
| OFFICIAL CAPACITY AS ATHLETIC | § | |
| DIRECTOR/HEAD FOOTBALL | § | |
| COACH; RICHARD DAVIS, | § | |
| INDIVIDUALLY AND IN HIS | § | |
| OFFICIAL CAPACITY AS ASSISTANT | § | |
| FOOTBALL COACH; JESS | § | |
| GOLIGHTLY, INDIVIDUALLY AND | § | |
| IN HIS OFFICIAL CAPACITY AS | § | |
| ASSISTANT FOOTBALL COACH; | § | |
| MATTHEW BENTLEY, INDIVIDUALLY | § | |
| AND IN HIS OFFICIAL CAPACITY AS | § | |
| ASSISTANT FOOTBALL COACH; | § | |
| CHRISTOPHER JAMES CAVNESS, | § | |
| INDIVIDUALLY AND IN HIS OFFICIAL | § | |
| CAPACITY AS ASSISTANT FOOTBALL | § | |
| COACH; TAYLOR WULF, | § | |
| INDIVIDUALLY AND IN HIS OFFICIAL | § | |
| CAPACITY AS ASSISTANT FOOTBALL | § | |
| COACH; AND RAYMOND BUSE, | § | |
| INDIVIDUALLY AND IN HIS OFFICIAL | § | |
| CAPACITY AS ASSISTANT FOOTBALL | § | |
| COACH, | § | |
| | § | |
| *Defendants*. | § | |

\

1

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Donna Yarbrough, Individually, and Troy Yarbrough, Individually, and as Parents and Next Friends of C.Y., a minor, file this their First Amended Complaint and complain of the conduct of Defendants Santa Fe Independent School District ("Santa Fe ISD"); Board of Trustees of Santa Fe Independent School District ("Board of Trustees"); Dr. Leigh Wall, Individually and in his Official Capacity as Superintendent of Santa Fe Independent School District ("Dr. Wall"); Mark Kanipes, Individually and in his Official Capacity as Athletic Director/Head Football Coach of Santa Fe Independent School District ("Mr. Kanipes"); Richard Davis, Individually and in his Official Capacity as an Assistant Football Coach of Santa Fe Independent School District ("Mr. Davis"); Jess Golightly, Individually and in his Official Capacity as an Assistant Football Coach of Santa Fe Independent School District ("Mr. Golightly"); Matthew Bentley, Individually and in his Official Capacity as an Assistant Football Coach of Santa Fe Independent School District ("Mr. Bentley"), Christopher Cavness, Individually and in his Official Capacity as an Assistant Football Coach of Santa Fe Independent School District, ("Mr. Cavness"); Taylor Aaron Wulf, Individually and in his Official Capacity as an Assistant Football Coach of Santa Fe Independent School District ("Mr. Wulf"); and Raymond Buse, Individually and in his Official Capacity as an Assistant Football Coach of Santa Fe Independent School District ("Mr. Buse").   Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the acts, as permitted by law. In support thereof, Plaintiff will respectfully show as follows:

### A. PARTIES

1.     Plaintiff, Donna Yarbrough, Individually, as a Parent, and as a Next Friend of C.Y, a minor, is an individual who at all relevant times resided in Santa Fe, Galveston County, Texas.

\

2.    Plaintiff, Troy Yarbrough, Individually, as a Parent, and as a Next Friend of C.Y., a minor, is an individual who at all relevant times resided in Santa Fe, Galveston County, Texas.

3.    Defendant Santa Fe Independent School District ("Santa Fe ISD") is a school district organized under the laws of the State of Texas and may be served by and through its Superintendent, Dr. Leigh Wall, at 4133 Warpath, Santa Fe, Texas 77510, or wherever he may be found. Santa Fe ISD has not appeared in this case.

4.    Defendant the Board of Trustees of Santa Fe Independent School District ("Board of Trustees") is a committee organized under Santa Fe ISD and may be served by and through its President, J.R. "Rusty" Norman, at 4414 Burditt, Santa Fe, Texas 77510, or wherever he may be found. The Board of Trustees has not appeared in this case.

5.    Defendant Dr. Leigh Wall ("Dr. Wall"), an individual, is the Superintendent of Santa Fe ISD and may be served with process by serving him at 4133 Warpath, Santa Fe, Texas 77510, or wherever he may be found. Dr. Wall is being sued Individually and in his Official Capacity as Superintendent of Santa Fe Independent School District. Dr. Wall has not appeared in this case.

6.    Defendant Mark Kanipes ("Mr. Kanipes"), an individual, is the Athletic Director and Head Football Coach of the Santa Fe High School football team and may be served with process by serving him at 803 Forest Bay Court, Houston, Texas 77062, or wherever he may be found. Mr. Kanipes is being sued Individually and in his Official Capacity as the Athletic Director and Head Football Coach of the Santa Fe High School football team. Mr. Kanipes has not appeared in this case.

7.    Defendant Richard Davis ("Mr. Davis"), an individual, is an Assistant Football Coach of the Santa Fe High School football team and may be served with process by serving him

at 16000 Hwy 6, Santa Fe, Texas 77517, or wherever he may be found. Mr. Davis is being sued Individually and in his Official Capacity as an Assistant Football Coach of the Santa Fe High School football team. Mr. Davis has not appeared in this case.

8.      Defendant Jess Golightly ("Mr. Golightly"), an individual, is an Assistant Football Coach of the Santa Fe High School football team and may be served with process by serving him at 629 Westwood Circle, La Marque, Texas 77568, or wherever he may be found. Mr. Golightly is being sued Individually and in his Official Capacity as an Assistant Football Coach of the Santa Fe High School football team. Mr. Golightly has not appeared in this case.

9.      Defendant Matthew Bentley ("Mr. Bentley"), an individual, is an Assistant Football Coach of the Santa Fe High School football team and may be served with process by serving him at 5113 County Road 166, Alvin, Texas 77511-6174, or wherever he may be found. Mr. Bentley is being sued Individually and in his Official Capacity as an Assistant Football Coach of the Santa Fe High School football team.

10.      Defendant Christopher James Cavness ("Mr. Cavness"), an individual, is an Assistant Football Coach of the Santa Fe High School football team and may be served with process by serving him at 421 Hawks View Drive, La Marque, Texas 77568, or wherever he may be found. Mr. Cavness is being sued Individually and in his Official Capacity as an Assistant Football Coach of the Santa Fe High School football team.

11.      Defendant Taylor Wulf ("Mr. Wulf"), an individual, is an Assistant Football Coach of the Santa Fe High School football team and may be served with process by serving him at 1825 Shouse Road, Santa Fe, Texas 77510, or wherever he may be found. Mr. Wulf is being sued Individually and in his Official Capacity as an Assistant Football Coach of the Santa Fe High School football team.

\

12.     Defendant Raymond Buse ("Mr. Buse"), an individual, is an Assistant Football Coach of the Santa Fe High School football team and may be served with process by serving him at 116 Sandstone Bend Lane, League City, Texas 77539, or wherever he may be found. Mr. Buse is being sued Individually and in His Official Capacity as an Assistant Football Coach of the Santa Fe High School football team. Mr. Buse has not appeared in this case.

## B. JURISDICTION AND VENUE

13.     This Court has jurisdiction over Plaintiffs' claims pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the Constitution, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

14.     Venue is proper under 28 U.S.C. § 1391(b), because the events and omissions giving rise to Plaintiffs' claims occurred in the Southern District of Texas, Galveston Division.

15.     Counsel for Plaintiffs hereby certify that the damages recoverable in this civil action exceed the sum of $5,000.000.00, exclusive of interest and costs.

## C. INTRODUCTION

16.     Of paramount importance is to protect the health and safety of our children who participate in student athletics.   This is a critically important civil rights case concerning traumatic physical and mental injuries sustained by a male high school student.   Each year numerous children are injured across the country participating in sporting events. A number of injuries result due to a systemic culture of winning at all costs. Children are marshalled into arenas to battle for championships to the amusement of spectators. The school districts and schools demand winning teams and championships. However, in order to win championships, child athletes are subjected to training regimens that disregard their health, safety, and well-being. Drills are conducted in practice that are dangerous and are known to cause long term serious injuries while under the supervision of the coaches.

\

17.     In this case, Plaintiff C.Y., a male high school student at Santa Fe High School participated in drills and practices that resulted in repetitive helmet to helmet contact and other head trauma. Indeed, the coaching staff required the young athletes to hit hard and engage in aggressive contact drills. It is well known that significant long-term injury is likely to occur from helmet to helmet contact and other head trauma. In fact, due to the known dangers of helmet to helmet contact and head trauma, the National Football League ("NFL"), the National Collegiate Athletic Association ("NCAA") and the University Interscholastic League ("UIL") have implemented rules that prohibit helmet to helmet contact and other rules in an attempt to protect the athletes from head trauma. Despite knowledge of the dangers of helmet to helmet contact and head trauma, Santa Fe ISD and its Board of Trustees, individually, and by and through the individual coaching staff created a danger by failing to effectively enact, implement, enforce, and train regarding policies, procedures, and practices to protect student athletes.

18.     The Center of Disease Control estimates that 1.6 million to 3.8 million traumatic brain injuries occur each year as a result of sports and recreational activities. Kristina M. Gerardi, *Tackles that Rattle the Brain,* 18 SPORTS LAW. J. 181, 190 (2011).

### D. <u>STATEMENT OF FACTS</u>

19.     C.Y. was born on October 16, 2000.

20.     At all relevant times, Donna Yarbrough, Troy Yarbrough and C.Y. resided in the Santa Fe Independent School District ("SFISD") in Galveston County, Texas. Accordingly, at all relevant times, Plaintiff C.Y. was eligible to and did attend school in SFISD.

21.     Donna Yarbrough, Troy Yarbrough and C.Y. are zoned to Santa Fe High School ("SFHS"), which is the only high school in his district.

22.     C.Y. began his ninth-grade year in SFHS in Santa Fe, Texas during the 2015-2016

school year.

23.     C.Y. began playing football in SFISD in seventh (7th) grade at Santa Fe Junior High ("SFJH").

24.     In May 2015, at the end of his eighth-grade year at SFJH, C.Y. underwent a baseline brain assessment test referred to as an ImPACT (Immediate Post-Concussion Assessment and Cognitive Testing) Clinical Report.   This test was believed to be performed as part of a concussion protocol implemented by SFISD. The ImPACT Clinical Report is a neurocognitive screening tool which provides diagnostic information regarding recovery from injury.   Recovery from concussions is difficult to track.   The tracking of recovery following an injury requires the analysis of test performance across a number of neurocognitive factors.   The ImPACT Report has to two components, baseline testing and post-injury testing which are used in conjunction to determine if an athlete can and when return to the activity safely.

25.     SFISD clearly acknowledged and was aware of the dangers of traumatic brain injury by implementing the ImPACT Report procedures.

26.     ImPACT Clinical Reports and baseline assessments are commonplace and required in many private and public schools each year.

27.     SFISD did not require yearly baseline ImPACT Clinical Reports as a prerequisite to play sports.

28.     C.Y.'s baseline ImPACT Clinical Report performed in May 2015 did not reveal any cognitive abnormalities.

29.     C.Y. did not suffer any severe head trauma while playing sports at SFJH.

30.     C.Y. enrolled in SFHS for Ninth (9th) grade for the 2015 – 2016 school year.

31.     C.Y. continued to play football without injury until his sophomore year.

\

32.     The coaching staff at SFHS kept records and statistics for each player which included such information as the height, weight, and body mass of each player as part of its customary practice.

33.     Despite knowledge of each players' size, weight, and experience level, it is common practice for SFHS coaches to mismatch significantly larger players against smaller players in practice and scrimmages.

34.     Indeed, it was customary practice, policy and procedure for SFISD, the coaches and coaching staff to implement an aggressive scrimmage and practice culture and system where head to head and upper body contact was not only tolerated and accepted, but designed and encouraged. In fact, if the students, including C.Y. did not engage in a brutal, repetitive, and aggressive manner, the student athlete was ridiculed and subjected to unfair and unreasonable treatment.   The coaches would regularly yell at the players to hit harder, again, again and again. The louder the sound when the student athletes collided, the better.

35.      It is common practice for SFHS coaches to line up older, bigger, higher level players against younger, smaller less skilled players. For example, the coaches would conduct scrimmages where the junior varsity offensive line would match up against the varsity defensive line.   Accordingly, older, larger defensive players would hit and tackle smaller, younger offensive players in an effort to cross the line of scrimmage. The offensive linemen were told to hit and hold back the defensive players.

36.     On September 21, 2016, C.Y. was at football practice during his 4th period. Since at least the beginning of school, the junior varsity and varsity football teams conducted practice and scrimmages during 4th period, and then again after school.   Therefore, C.Y. and other members of the football teams had two-a-day practices.

\

37.     On the day in question, C.Y. weighed approximately 130-140 pounds.

38.     The player across from C.Y was C.P., a defensive tackle, an older, more skilled and substantially larger player.

39.     C.Y. was on the junior varsity team and playing an offensive position, left guard, for scrimmages.

40.     The ostensible object of the drill was for C.Y. to prevent C.P. from crossing the line of scrimmage.

41.     Coaches Golightly, Davis, Bentley, Cavness, Wulf, and Buse, along with Head Football Coach Kanipes, conducted the scrimmages.

42.     Mark Kanipes was the Athletic Director, Head Football Coach, and the supervisor of the football program at SFHS.

43.     It is well known and well documented that helmet to helmet contact and other upper body contact can cause significant, permanent injuries, including, but not limited to concussions and severe brain trauma.

44.     During the practice, C.Y. participated in a scrimmage that caused C.Y. and C.P. to collide in violent helmet to helmet contact numerous times. Indeed, the coaches were yelling at C.Y. and C.P, to line up again, and again, and again, and to hit harder, harder, harder.

45.     Indeed, the coaches encouraged, if not demanded, an aggressive and repetitive full on head to head and upper body contact.

46.     The coaches ran the same drill over and over resulting in continued, repetitive head to head and upper body contact.

47.     The coaches never stopped or intervened in the constant helmet to helmet contact. Accordingly, C.Y. was repeatedly hit in the head by C.P., and possible others during this practice.

\

Importantly, this type of drill and practice was commonplace and routinely occurred in practice and scrimmage at SFHS.

48.     After practice, C.Y. changed clothes and went to lunch. He began to experience a severe headache.

49.     He contacted his mother who instructed him to report to the school nurse which he did. He told the nurse that he was experiencing a headache after football. The nurse sent C.Y. to the football trainer.

50.     C.Y. reported to the trainer, Brooke Griffin ("Griffin"), that he was experiencing a severe headache. Griffin instructed C.Y. to return for afternoon practice but not participate. At no time did Griffin properly examine C.Y. or inquire as to what occurred at the practice.

51.     As instructed, C.Y. returned for afternoon practice but did not participate.

52.     After practice, C.Y. again reported to Griffin that he was still experiencing a severe headache.

53.      Griffin advised C.Y. that he might have a concussion. Griffin told C.Y. to go home and rest, but not take any medicine. Griffin said that if the symptoms continued the next day C.Y. should report back to her.

54.     The next day, September 22, 2016, C.Y. woke with a severe headache and reported to Griffin as directed. Griffin directed him to seek medical treatment.

55.     It is believed that Griffin is a certified sports trainer. However, Griffin is not medically qualified to make a diagnosis regarding severe head trauma or prescribe medical treatment.

56.     On September 23, 2016, Mr. and/or Mrs. Yarbrough took C.Y. to the Houston Methodist Orthopedic & Sports Medicine Clinic ("HMOS"), located at 2020 NASA Parkway,

\

Houston, Texas.   Defendants directed the Yarbroughs to this clinic.   At that time, C.Y. reported that he collided helmet to helmet with another player and began to have headaches with light and noise sensitivity.   He also reported blurry vision and vomiting on September 21, 2016. He stated that he notified his athletic trainer.   C.Y. was diagnosed with a concussion and cervical strain/sprain.

57.     Indeed, after discussions with Mr. Yarbrough and C.Y., the physician concluded that this was not the first concussion that C.Y. suffered and that he had likely suffered a concussion a few weeks earlier and had been practicing and playing with a concussion.   The physician ordered rest and provided the Yarbroughs with an activity restriction list and instructed them to return within seven (7) to ten (10) days.

58.     On September 30, 2016, C.Y. returned to HMOS with continued symptoms, including, mild-severe headaches that worsened in the environment of bright lights and loud sounds.   He additionally reported nausea when the headaches were severe.   He described additional symptoms, including lightheadedness, dizziness, and fatigue.   Ms. Yarbrough reported that C.Y. appeared nervous, irritable, and emotional.   C.Y. stated that he felt mentally foggy and slowed down.

59.     C.Y. underwent an ImPact Clinical Report which when compared to the May 2015 baseline report, showed impairments and decreased cognitive functioning.   The physician also ordered an MRI of the brain and cervical spine which were performed STAT on September 30, 2016. The brain MRI revealed objective, positive findings consistent with a compression type head injury.

\

60.     As a direct and proximate result of the concussion, C.Y. was provided special accommodations at school and received additional medical care and treatment.   C.Y. continues to suffer from the effects of the concussion and head injury.

61.     C.Y. has not played football since September 21, 2016.   Indeed, he can no longer play any sport where there is any potential of any contact. Indeed, C.Y. has not been released to play any sports.

62.     Football players who encounter violent and sudden contact with other players in a collision can suffer injuries including, but not limited to, concussions and permanent traumatic brain injuries.

63.     The physical signs and symptoms of a concussion include, but are not limited to, headache, nausea, balance deficiencies, dizziness, visual deficiencies, numbness and/or tingling, and feeling dazed.

64.     At all times pertinent hereto, Defendants knew, or should have known, that traumatic brain injuries, including, but not limited to concussions, are a hazard associated with football activities.

65.     At all times pertinent hereto, Defendants knew, or should have known, that traumatic brain injuries, including, but not limited to concussions, can occur from violent and aggressive hits during football games and practices.

66.     At all times pertinent hereto, Defendants knew, or should have known, that student athlete participation in athletic activities could result in injuries and/or traumatic brain injury symptoms and posed a significant risk of serious bodily injury and threatened the bodily integrity of said student athletes.

67.     At all times pertinent hereto, Defendants knew, or should have known, that traumatic brain injuries, including but not limited to concussions, occurred frequently in football related activities.

68.     At all times pertinent hereto, Defendants knew, or should have known, that the bodily integrity of student athletes required proper medical monitoring, supervision and clearance once an impact was sustained which resulted in symptoms associated with concussion and/or traumatic brain injury.

69.     At no time pertinent hereto, did Defendants have a proper policy, procedure, and practice in place to instruct their student athletes, including but not limited to C.Y., on the causes, hazards, symptoms and dangers of concussions and traumatic brain  injuries.

70.     Defendants failed to enact, implement, and/or enforce proper and adequate policies, procedures and practices relating to the prevention of head injuries resulting from athletic activities.

71.     This deliberate indifference to the health, safety and welfare of student athletes in failing to educate said student athletes on the causes, symptoms, and dangers of traumatic head injuries was the common policy and custom of Defendants.

72.     This deliberate indifference to the health, safety and welfare of their student athletes in failing to monitor said student athletes was the common policy, practice and custom of Defendants.

73.     This deliberate indifference to the health, safety and welfare of student athletes in failing to enact, implement, and/or enforce adequate policies, procedures and/or practices for the prevention, monitoring, and training relating to head injuries resulting from athletic activities was the common policy, practice, and custom of Defendants.

\

74.     These failures by Defendants were a normal practice, custom, and policy and constitute a deliberate indifference to the health, safety and welfare of student athletes of Santa Fe ISD, including, but not limited to, C.Y.

75.     Upon the filing of the instant Complaint, C.Y. continues to suffer from serious, permanent effects of his traumatic brain injuries.

76.     Defendants acted with willful disregard to C.Y.'s interest in his bodily integrity and human dignity.

77.     Defendants' policies, practices, and/or procedures failed to adhere to common industry standards and/or state athletic standards with respect to the prevention, evaluation, and review of traumatic brain injuries.

78.     As a direct result of the previously described actions and inactions of these Defendants, C.Y. suffered and will continue to suffer the following symptoms and conditions: second impact syndrome; traumatic brain injury; slowed motor activity; altered sleep patterns; recurrent headaches and head pain; nausea; dizziness; balance problems; impaired concentration; poor short-term memory; hypersensitivity to light and sounds; mood swings; and overall moderate brain dysfunction suggestive of bilateral diffuse axonal injury secondary to a traumatic brain injury. Defendants collectively acted with a degree of culpability that shocks the conscience of a reasonable person under like circumstances.

79.     A relationship between Defendants and Plaintiff C.Y. existed such that Plaintiff was a foreseeable victim of the Defendants' actions, and he was a member of a discrete class of persons subjected to the potential harm brought about by Defendants' actions.

80.     Defendants affirmatively used their authority in a way that created a danger to Plaintiff that rendered him more vulnerable to danger than had Defendants not acted at all.

\

## E. CAUSES OF ACTION

### (1)   VIOLATIONS OF THE UNITED STATES OF AMERICA'S CONSTITUTION UNDER AMENDMENT FOURTEEN DUE PROCESS CLAUSE FOR INJURY AS A RESULT OF A STATE CREATED DANGER ENFORCEABLE VIA 42 U.S.C. §1983.

### CLAIMS AGAINST ALL DEFENDANTS

81.     All preceding paragraphs are incorporated by reference as if pled herein.

82.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 that challenges the constitutionality of the actions of Defendants that resulted in Plaintiff C.Y.'s injuries.

83.     All acts taken by Defendants were taken under color of law as defined by 42 U.S.C. § 1983, were under the pretense and color of law in their official capacity, and under the pretense of the statutes, ordinances, policies, practices, customs, regulations and/or usages of Defendants and/or the State of Texas.

84.     More specifically, at all times relevant hereto, C.Y. possessed both substantive and procedural due process rights to be free from state occasioned and/or created dangers which caused harm to his bodily integrity and human dignity, and which are protected by the United States Constitution.

85.     It was unreasonable and a violation of their duties and responsibilities for these Defendants to ignore C.Y.'s safety and well-being, and to expose him to serious and traumatic injuries, by requiring him to participate in practice drills that culminated with numerous significant blows to the head.

86.     It was clearly foreseeable that by instructing C.Y. to participate in drills and practice that required helmet to helmet and other upper body contact, C.Y. faced a substantial risk of serious harm, and the Defendants failed to take reasonable steps to enact, implement, and/or enforce reasonable policies, practices, and procedures to avoid the harm.

\

87.     At all times material and relevant hereto, Defendants were aware of and willfully disregarded the inherent and extreme dangers to a student athlete who participates in athletic activities after suffering head injury.

88.     Defendants failed in their positions of authority, under color of state law, to take appropriate steps to minimize the risk of serious injury to football players such as that actually suffered by C.Y.

89.     Defendants took no reasonable or proper steps to prevent or minimize the risk of harm that C.Y. actually suffered, but rather allowed such potentially high – risk activity to occur under the above unreasonably dangerous circumstances with willful disregard and/or deliberate indifference for C.Y.'s safety.

90.     C.Y. was an obvious member of a class subjected to the harm brought about by the Defendants' actions and/or inactions.

91.     By way of Defendants' actions and/or inactions, said Defendants utilized their position of authority and power to create a danger to C.Y. and/or placed C.Y. in a more vulnerable manner to the known risk of harm.

92.     The Defendants' actions and/or inactions demonstrated an adopted practice, custom or policy in deliberate indifference to C.Y.'s overall health, safety and welfare.

93.     Defendants, by their wanton and willful disregard and/or indifference for the safety of C.Y.,   and their deliberate indifference to C.Y.'s constitutional rights, created a dangerous environment by continuing to place C.Y. against a significantly larger and more skilled player to participate in football practices, scrimmages, and drills thereby increasing the risk of and directly and proximately causing the severe, permanent injuries which were foreseeable, substantially certain to occur and actually suffered by Plaintiff, both generally and in the following respects:

\

a.       failing to properly evaluate C.Y. for injuries, despite the fact that all of the incidents pled herein occurred in the open view of the coaches and in the during normal course of practice;

b.       allowing C.Y. to participate in the type of activity, including, aggressive, repetitive head to head and other upper body contact on September 21, 2016, and before which foreseeably would lead to a significant head injury;

c.       instructing C.Y. to continue the scrimmage against a significantly larger and more skilled player;

d.       failing to train coaches on safety protocol, practices and procedure, and indicators of a concussion or other head injury;

e.       allowing improperly trained coaches to be responsible for student athletes' safety during team practices;

f.       failing to have proper policies, practices and procedures in place to prevent, identify and monitor head injuries and concussions;

g.       violating and failing to comply with all pertinent federal and state statutes, local ordinances and all other rules, enactments or regulations, applicable or in effect, be they administrative, industry – wide or otherwise, pertaining to school athletics;

h.       failing to instruct student athletes, including but not limited to C.Y., on the causes, symptoms and dangers of traumatic brain injuries.

i.       failing to utilize a form of baseline testing on a yearly basis to monitor the progression and/or regression of head injuries sustained by student athletes, including but not limited to C.Y.;

j.       failing to appropriately assess C.Y. and other athletes after continued head to head and other upper body contact;

k.       failing to perform an annual impact test on C.Y.;

l.       failing to properly notify qualified medical personnel when it was clear that C.Y. had sustained injury;

m.       failing to adopt, enact, employ and enforce proper and adequate safety programs, training, precautions, procedures, measures and plans;

n.       failing to adopt, enact, implement, employ and enforce proper and adequate safety programs, precautions, procedures, measures and plans commensurate to the hazard of traumatic brain injury resulting from football

\

activities;

o.      failing to take other necessary precautions to prevent injuries, such as C.Y.'s, from occurring;

p.      failing to understand the risks associated with a traumatic brain injury; and

q.      instructing, directing, and requiring C.Y., to repeatedly engage in drills and practices several each day which required direct head to head and other upper body contact over and over again while all the time requiring each hit to be harder and harder.

94.     Such actions and/or inaction exhibited by Defendants caused Plaintiffs' injuries shocks the conscience of a reasonable person under like circumstances.

95.     The unlawful and/or improper actions stated herein were taken and/or ratified by final policy makers for Defendants and thus constitute policies, practices, customs and usages sufficient to impose liability on all Defendants.

96.     As a direct and proximate result of the Defendants' unconstitutional acts described above, C.Y. sustained severe and grievous injuries and loss of constitutional rights as described and averred herein.

97.     Plaintiffs demand judgment against the Defendants for such damages as may be permitted pursuant to applicable law, together with interest, costs and attorney's fees.

**(2) VIOLATIONS OF THE UNITED STATES OF AMERICA'S CONSTITUTION UNDER AMENDMENT FOURTEEN – DUE PROCESS CLAUSE FOR INJURY TO HUMAN DIGNITY AND BODILY INTEGRITY ENFORCEABLE VIA 42 U.S.C. §1983.**

**PLAINTIFFS V. ALL DEFENDANTS**

98.     All preceding paragraphs are incorporated by reference as if pled herein.

99.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 that challenges the constitutionality of the actions of Defendants that resulted in the injuries suffered by C.Y.

100.    Defendants are state actors as defined in 42 U.S.C. § 1983.

\

101.    All acts taken by Defendants were taken under color of law as defined by 42 U.S.C. § 1983, were under the pretense and color of law in their official capacity, and under the pretense of the statutes, ordinances, policies, practices, customs, regulations and/or usages of Defendants and/or the State of Texas.

102.    At all times mentioned herein and material hereto, C.Y. possessed a liberty interest in the freedom from injury to human dignity and bodily integrity, which rights are secured under the Fourteenth Amendment to the Constitution of the United States, and by Title 42, United States Code, §1983.

103.    The Defendants developed policies, practices, procedures, and customs which were not in accord with the Constitution of the United States and which were contrary to Federal protection of the safety, rights, health and welfare of C.Y., and/or failed to develop policies, procedures, practices, and customs which were in accord with the Constitution of the United States and Federal protection of the safety, rights, health and welfare of C.Y.

104.    At all times mentioned herein and material hereto, these Defendants, by and through their wanton and willful disregard for the safety of C.Y., and their deliberate indifference to C.Y.'s constitutional rights, created a dangerous environment by allowing and encouraging C.Y. to participate a sports activity that is known to be inherently dangerous.

105.    These Defendants knew or should have known that by running scrimmages and practices which resulted in numerous helmet to helmet collisions and other upper body contact posed a significant risk of serious bodily injury and increased the chances of causing serious injury to C.Y., namely a concussion, and permanent head injury.

106.    Additionally, Defendants acted with deliberate indifference to C.Y.'s constitutional rights and affirmatively acted to create a danger to C.Y., and caused his injuries by:

\

a.    failing to train coaches on safety protocol, practices, procedures, policies and indicators of a concussion or other head injury;

b.    allowing improperly trained coaches to be responsible for student athletes' safety during team practices;

c.    failing to have proper procedures in place to identify and treat head injuries and concussions;

d.    violating and failing to comply with all pertinent federal and state statutes, local ordinances and all other rules, enactments or regulations, applicable or in effect, be they administrative, industry-wide or otherwise, pertaining to school athletics;

e.    failing to instruct student athletes, including but not limited to C.Y., on the causes, symptoms and dangers of traumatic brain injuries;

f.    failing to utilize a form of baseline testing on a yearly basis to monitor the progression and/or regression of head injuries sustained by student athletes, including but not limited to C.Y.;

g.    failing to appropriately assess C.Y. by performing cognitive testing;

h.    failing to perform an annual impact test on C.Y.;

i.    failing to properly refer C.Y for immediate medical evaluation when he complained and/or was observed to complain and/or experience signs and symptoms off headaches that resulted from helmet to helmet contact;

j.    failing to adopt, enact, employ, implement and enforce proper and adequate safety programs, precautions, policies, procedures, measures and plans;

k.    failing to adopt, enact, employ, implement, and enforce proper and adequate safety programs, precautions, procedures, measures and plans commensurate to the hazard of traumatic brain injury resulting from football activities;

l.    failing to take other necessary precautions to prevent incidents, such as C.Y.'s, from occurring; and

m.    failing to understand the risks associated with a traumatic brain injury; and

n.    instructing, directing, and requiring C.Y., to repeatedly engage in drills and practices several each day which required direct head to head and other upper body contact over and over again while all the time requiring each hit to be harder and harder.

\

107.    The unlawful actions of the coaches were accepted, adopted, and/or ratified by final policy makers for Defendants and thus constitute policies, practices, customs and usages sufficient to impose liability.

108.    The Defendants' conduct and lack thereof placed C.Y. in a dangerous position which was at all times materially foreseeable.

109.    Defendants knew or should have known that their improper policies, procedures, practices and/or customs, and/or their lack of adequate policies, procedures, practices, and/or customs would result in injury and denial of C.Y.'s constitutional rights.

110.    The inadequacy of Defendants' existing practices, procedures, and policies was so likely to result in violation of C.Y.'s constitutional rights that Defendants can be reasonably said to have been deliberately indifferent to those rights. As a direct and proximate result of the liability producing conduct of Defendants and their wanton and willful disregard for the safety of C.Y., which shocks the conscience, C.Y., was caused to suffer those permanent and severe injuries described above, and was deprived of his liberty interest and caused to suffer injury to his human dignity and bodily integrity, without due process of law guaranteed by the Fourteenth Amendment of the United States Constitution.

111.    At all times mentioned herein and material hereto, Defendants acted with willful disregard for and/or reckless indifference to C.Y.'s safety, acted with deliberate indifference to C.Y.'s constitutional rights, and rendered C.Y. more vulnerable to serious bodily injury.

112.    The Defendants' acts were the proximate cause of C.Y.'s severe and permanent injuries.

113.    Defendants' denial of C.Y.'s rights under the Fourteenth Amendment was egregious, irrational and objectively unreasonable.

\

114. Plaintiffs demand judgment against the Defendants for such damages as may be permitted pursuant to applicable law, together with interest, costs and attorney's fees.

## F. **IMMUNITY**

115.    The individual Defendants are not entitled to qualified or sovereign immunity because Defendants' actions violate an established constitutional right and Defendants' conduct was objectively unreasonable in light of clearly established law at the time of the incident.

116.    The individual Defendants were consciously indifferent to the well settled constitutional rights and they are consciously indifferent with respect to their duties to respect those rights.

117.    The right to bodily integrity is a well-settled constitutional right. The right to be free from harm and injury, including a traumatic brain injury, is a subset of that right.    No rational or reasonable person who was a coach or athletic director could believe that there were uncertain or unclear boundaries that would have permitted an intentional or reasonably certain injury to a student athlete in this circumstance.

118.    The repeated exercises, drills, practices and scrimmages that the individual Defendants required of Plaintiff and others violate routinely published and available codes and practices for coaches and athletic instructors.    Coaches and athletic instructors, under all available literature regarding their duties, are to be conscious of safety, protection and well-being of student athletes and, are to insure that activities required are appropriate for the age, size, maturity, experience and level of ability of each individual.

119.    The individual Defendants were on notice of the requirements for their profession. The requirements show that they knew that the activities required were in violation of the core principles of the assigned position.    No rational or reasonable coach or athletic instructor would

\

have thought differently.

120.    Implementing and demanding these particular exercises, drills and scrimmages for C.Y., and others, is a conscious disregard of the right to bodily integrity.

121.    Indeed, the actions and/or omissions of the individual Defendants in requiring and demanding these exercises, practices and/or scrimmages of C.Y., and others is conduct that shocks the conscious of the community and Court because it is so far beyond the pale that no rational or reasonable adult would think it appropriate in any circumstance, much less a "trained" athletic instructor. This is especially shocking given the motivation to violate the rights of C.Y when the violation was so utterly apparent that it could be said to be an intent to injure, or so close to an intent as to be reasonably certain that injury would occur.

122.    The School District and Board Defendants ratified that acts, omissions and customs of school district personnel and staff.   As a result, the School District and Board Defendants are responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of C.Y.

## G. DAMAGES

123.    As a direct and proximate result of the above-referenced and described conduct, Plaintiff suffered and continues to suffer the following injuries and damages and for which he seeks to recover:

a.    Past and future physical pain and suffering;

b.    Past and future mental anguish associated with the injury, the circumstances leading to the injury, and other subsequent events;

c.    Past and future reasonable and necessary medical costs and expenses;

d.    Future loss of earning capacity;

e.    Past and future disability and disfigurement; and

\

f.    Any and other damages allowed and recoverable under 42 U.S.C., Section 1983, including but not limited to, attorney's fees and exemplary damages as allowed by law.

## H . **REQUEST FOR JURY TRIAL**

125.    Plaintiffs assert their rights under the Seventh Amendment to the U.S. Constitution and demand, in accordance with Federal Rules of Civil Procedure 38, a trial by jury on all issues.

## **PRAYER**

For the foregoing reason, the Plaintiffs respectfully request that the Court enter judgment against Defendants consistent with the relief requested herein, and for any and all relief Plaintiffs may show they are entitled, including actual damages, nominal damages, court costs, preparation and litigation costs, expert fees, attorney's fees, and exemplary damages, and for its appeal if required and for such other relief as this Court may deem just and proper in law and equity.

Respectfully submitted,

**SOUTHERLAND LAW FIRM**

/s/ J. Alfred Southerland
J. Alfred Southerland
State Bar No. 18860050
4141 Southwest Freeway
Suite 300
Houston, Texas 77027
Telephone: (281) 928-4932
Facsimile:   (713) 228-8507
alf@southerlandlawfirm.com

\

**THE CHANDLER LAW FIRM, L.L.P.**

<u>/s/ Sherry Scott Chandler</u>
Sherry Scott Chandler
State Bar No. 17915750
Lewis M. Chandler
State Bar No. 24036350
4141 Southwest Freeway
Suite 300
Houston, Texas 77027
Telephone: (713) 228-8508
Facsimile: (713) 228-8507
sherry@chanderlawllp.com
lewis@chanderlawllp.com

**ATTORNEYS FOR PLAINTIFFS**

\